IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MORRIS LEON BARTON,<br><br>Defendant. | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS<br><br>Case No. 2:21-CR-81-DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendant Morris Leon Barton's Motion to Suppress [ECF No. 54]. On February 8, 2023, the court held an evidentiary hearing on the motion, and on March 6, 2023, the court heard closing arguments. At the hearings, Defendant appeared and was represented by Earl Xaiz, and the United States was represented by Allison H. Behrens and Adam Braskich. The court has carefully considered the evidence and testimony presented at the evidentiary hearing, the memoranda and arguments submitted by the parties, and the law and facts relating to the motion. Now being fully advised, the court issues the following Findings of Fact, Conclusions of Law, and Memorandum Decision and Order on Defendant's Motion to Suppress.

**FINDINGS OF FACT**

On August 5, 2017, Mohit Abraham was traveling on a flight from Salt Lake City, Utah, to Portland, Oregon. During the flight, Mr. Abraham noticed that the man sitting in the seat next to him was actively texting on his cell phone. Mr. Abraham was able to see that some of the

texts were sexual in nature—such as referring to oral sex, sucking and swallowing, and a nude photo—and the man had texted that she was so mature for a 16-year-old. During one of the exchanges, Mr. Abraham saw a photo of a young, black female's face. Because this texting concerned Mr. Abraham, he reported this information when he was disembarking in Portland. Port of Portland Police Officer Jason McKay, along with two other officers with the Port of Portland Police Department, responded to speak with Mr. Abraham about what he had seen. Mr. Abraham pointed out the individual seated next to him, who was later identified as Defendant Morris Barton, as Mr. Barton was at a gate preparing to board a flight to Amsterdam.

Officer McKay went and introduced himself to Barton and asked him to go somewhere nearby that was less congested. Barton was cooperative. McKay explained to Barton that a passenger was concerned about the texting he witnessed Barton doing during the flight from Salt Lake. Barton acknowledged that he was texting a girl who was 16 years old and that it could seem suspicious. He also stated that the girl was in another country.

McKay advised Barton of his *Miranda* rights. Barton acknowledged that he understood his rights and said he was comfortable talking with the officer. Barton also agreed to show Officer McKay the text conversation with the 16-year-old on his phone. Defendant held the phone and scrolled through the texts. McKay saw information consistent with what the witness has said he saw during the flight. McKay saw that the conversation between Barton and the 16-year-old was graphically sexual. There was sexual banter back and forth and an image that appeared to be a video clip of a black female having sex. The battery on the phone then died and the phone shut off. Barton told McKay that he was going to Uganda via Amsterdam to meet his 26-year-old girlfriend, but the 16-year-old girl he was texting on the phone lived in Belize.

Based on what McKay observed on the phone, the information the witness reported about the girl being 16 years old, and Barton's admissions that he had been texting a 16-year-old girl, McKay asked Barton if he would mind going to the airport police's office to continue talking. Barton consented and went with McKay to the office. The office was a seven-to-ten-minute walk. During that time, McKay and Barton engaged in idle chitchat and Barton remained cooperative.

McKay asked Barton to sit in an interview room and MacKay left the door open and got Barton a drink. McKay explained to Barton what he could expect to happen at the office. He explained that he had called the FBI to help and the FBI liaison would come talk to him. Although McKay had given Barton his *Miranda* rights, McKay did not place Barton under arrest, Barton was not in handcuffs, and Barton appeared to be there willingly. McKay did not tell Barton that he was free to leave, but McKay also never asked to leave, never asked McKay for an attorney, and never expressed concern that he was missing his flight to Amsterdam.

From the time McKay first approached Barton at the gate for the flight to Amsterdam until Special Agent June Piniewski with the FBI arrived to talk with Barton, McKay never touched Barton, did not raise his voice, did not make promises to Barton to obtain his cooperation, and did not display his weapon. McKay testified that Barton was exceedingly cooperative throughout the encounter. From the time he was approached until FBI SA Piniewski arrived at the office, McKay estimates it was about an hour to an hour and a half.

FBI SA Piniewski and Port of Portland Police Officer Jan Childers arrived to talk with Barton. Barton was still cooperative and did not express any concern with the length of his wait or with missing his flight. The interview began with a discussion of Barton's travel plans. He stated that he was on his way to Uganda where he was visiting his 26-year-old girlfriend, who

3

lives there. Barton also stated that three days earlier, he had met a girl online who was in Central America through the site or app "Caribbean Cupid." This girl originally told Barton that she was 19, but the day before his flight, she told him she was 16. Despite being told this, Barton continued to communicate with her. Barton stated that during the flight he was texting his girlfriend Sandra and this 16-year-old girl. Barton and the 16-year-old talked about all kinds of things and divulged to each other that they had both been sexually exploited when they were young.

     SA Piniewski explained that they were trying to clarify whether there was a misunderstanding with what the witness saw and that they would like to get Barton out of there as quickly as possible. She then asked if he would give her consent to look through his laptop and phone. When Barton expressed concern about other personal things that could be on his devices, Piniewski told him she did not care about anything else that was on the devices, as long as there was no child pornography. She said, "then we can kind of roll with that and get you your stuff back, and then hopefully just get you on your way."

     Barton responded, "I think this is where I say yes—in the presence of an attorney." Piniewski then asked: "So, are you saying that you would like to speak with an attorney?" Instead of responding yes or no, Barton stated, "I'm saying that you're scaring me . . and, uh, I don't know how far this is going to go so at this point, I mean, if you're ready to wrap this up, that would be fine, but if you're going to keep digging and digging, then . . . this is where I say no, I need an attorney."

     At that point, Officer Childers explained to Barton that they were doing their due diligence because a witness came forward thinking there was some interaction with what

appeared to be a 16-year-old, and it wasn't "a digging expedition," they just needed to get to the bottom of the report they received from the fellow passenger.

Defendant then asked, "If you search my computer, how many hours is it going to take?" Piniewski explained the process and told Barton probably 30 to 40 minutes. Barton asked for ten minutes to think about it. When the officers returned, Barton stated that his hesitancy was that he had personal photos of himself that he had shared in connection with his personal relationships. Piniewski and Childers assured Barton that they did not care about that personal stuff, they were not trying to humiliate him, and that they were looking only for child pornography.

Barton then expressed concern that he had naked pictures of his daughter on his computer from when she was five or six years old. Piniewski told him that his concern was a "great question" and that she knew the difference between child pornography and innocent family pictures. Barton then said, 'Yes, you have my permission."

As Piniewski began filling out the consent form, Barton said, "I'm sorry ladies, I can't do this. If you're going to make me sign stuff, I don't want to do that. You can put me in jail if you want. I'll get an attorney and he can decide whether you should look at my computer or not. I'm not an attorney, I really don't know the implications of signing stuff."

Officer Childers asked, "Did something change?" And Defendant responded, "Yeah, I thought we were talking like friends and now you're asking me to sign stuff like an attorney would. Now I'm nervous." He expressed concern about being able to understand the consent form because one of the things he has learned being a doctor is that "attorneys don't speak like I do." Piniewski then showed him the form so that he could see it was quite simple.

5

Barton looked over the consent form.  He then asked the officers if he could clarify something.  He noted that the consent form was a "blank check" to allow the agents to look for anything and everything on his phone and laptop.  He requested that the officers write on the consent form that "all you're looking for is child porn, that's the only thing you're looking for is child porn, and then I'll let you go through it."  He repeated, "I would like you to write, I'm searching for child porn only.  That's it."  Defendant then turned his laptop over so Piniewski could see the serial number to include on the form.  He then repeated, "For child pornography only.  Then that's fine."  After Piniewski added the requested information, Barton read the form again.

Barton then asked if he had the right to refuse because he could not remember the officers telling him that.  Piniewski responded, "You do have the right to refuse, you may be here a little bit longer, but you certainly have the right to refuse."  Barton then stated, "I agree to let agents take any items which they determine may be related to their investigation."  Piniewski responded: "So, if it has child pornography on it then we have a whole different set of things going on."  Barton assured her that he did not have any child pornography on his devices, and Piniewski responded that "that's what I am hoping."  Barton then signed the consent form.

Piniewski opened Barton's laptop to conduct a search using OS Triage.  OS Triage was not working so she searched Barton's cell phone.  They got the phone out of an envelope and charged it.  Because the passenger on the plane stated that he had observed the concerning conduct on "What's App," Piniewski searched for child exploitation material in that application.

Piniewski observed multiple conversations within the application.  She observed that the female "NB" had informed Barton that she was 16 years old.  She also saw that Barton and NB had sent several pictures of themselves to each other in the course of the chat conversation.

6

Barton told NB that he totally understood why she claimed to be nineteen on the dating app, asked if her mother was going to be okay with NB staying at a hotel with him, and that she is mature for sixteen. Barton sent pictures of males and females in sexual positions and told NB that he would like to do these positions with her. Barton made sexually suggestive comments to her, such as: "Can I eat your pussy?" and "Do you like to swallow?" Piniewski discussed this information with Barton, who admitted that NB was sixteen and he had just been "weak."

Piniewski determined that further investigation of Barton's devices was warranted and seized both his phone and laptop. Barton, however, was permitted to continue with his travel to Uganda.

On that same day, Piniewski applied for a search warrant in the United States District Court for the District of Oregon for permission to search Barton's laptop and his phone. A magistrate judge in that district issued the search warrant. The Untied States provided the court with the search warrant and the application for the search warrant.

On March 16, 2021, FBI Special Agent Jeff Ross applied for and obtained a search warrant for Barton's residence, located in Murray, Utah. A magistrate judge in the District of Utah issued the search warrant. The United States also submitted to this court the search warrant and application for the search warrant.

Investigators were never able to identify NB, the Belizean 16-year-old Barton was communicating with on August 5, 2017. Therefore, the evidence that Piniewski viewed on Barton's devices that day are not related to the charges currently pending against Barton. When investigators searched Barton's devices pursuant to the search warrants, they uncovered evidence that purports to show that in 2012, Barton had a sexual relationship with a minor in Jamaica, that he produced child pornography depicting that minor, and transported that child pornography

7

while traveling internationally. The execution of the second search warrant at Barton's home uncovered evidence that purports to show that between 2003 and 2007, Barton sexually abused two prepubescent minors with whom he had a close relationship and that he produced child pornography depicting their sexual abuse. That digital evidence supports Defendant's charges of two counts of transportation of child pornography, one count of possession of child pornography, and three counts of production of child pornography.

## CONCLUSIONS OF LAW

Barton moves to suppress evidence obtained from the consent search of his phone and laptop on August 5, 2017, and from the execution of search warrants later executed on those devices and other electronic devices located at his home. Defendant's primary contention is that his consent to search was invalid because he invoked his right to counsel and the agents did not honor those requests. The United States argues that Barton's Fifth Amendment rights were neither implicated nor violated.

Defendant acknowledges that the "Tenth Circuit has held, several times, that a consent to search is not an interrogation that necessitates Miranda warnings." *United States v. Romero*, 743 F. Supp. 2d 1281, 1337 (D.N.M. 2010) *aff'd* 749 F.3d 900 (10th Cir. 2014). However, he argues that because *Miranda* warnings were given in this case, they should be considered.

An officer's request to search a suspect's property does not constitute an interrogation requiring *Miranda* warnings. *United States v. Curls*, 219 Fed. Appx. 746, 754-55 (10th Cir. 2007). Moreover, a suspect's voluntary consent is "unaffected by the invocation of his *Miranda* rights." *United States v. Rodriguez-Garcia*, 983 F.2d 1563 (10th Cir. 1993).

In *Rodriguez-Garcia*, the defendant, while in police custody, invoked his *Miranda* right to remain silent. *Id.* at 1566, 68. Police officers then asked him for consent to search his storage

unit, and the defendant signed a consent form. *Id.* at 1566. The defendant argued that any consent given subsequent to his invocation of *Miranda* was invalid because once he indicated that he did not want to make further statements, all questioning had to cease. *Id.* at 1568. The Tenth Circuit disagreed, holding that "a consent to search is not the type of incriminating statement which the Fifth Amendment was designed to address." *Id.*

Therefore, despite Barton's references to needing an attorney, under Tenth Circuit law, his *Miranda* rights are not implicated by the officers' request for his consent to search his phone and laptop.

In any event, Barton never unequivocally invoked his right to counsel. A suspect who has waived his *Miranda* rights may invoke his rights at any time. *United States v. Nelson*, 450 F.3d 1202, 1212 (10th Cir. 2006). If a suspect invokes his right to remain silent, "further interrogation must cease." *Id.* Barton does not claim to have invoked the right to remain silent. A suspect's right to counsel, which Barton does claim to have invoked, must be unambiguous. *Davis v. United States*, 512 U.S. 452, 459 (1994).

In determining whether a suspect unambiguously invokes the right to counsel, the court looks at whether the suspect's statement is sufficiently clear that a reasonable officer would understand the statement to be a request for an attorney. *Nelson*, 450 F.3d at 1212, Requests that are equivocal and would leave a reasonable officer thinking that "the suspect might be invoking counsel" do not require officers to stop their questioning. *Davis*, 512 U.S. at 462.

In *Davis*, the Supreme Court held that the statement "maybe I should talk to a lawyer" was an ambiguous statement that did not merit cessation of the interrogation. *Id.* In *Mitchell v. Gibson*, 262 F.3d 1036, 1056 (10th Cir. 2001), the Tenth Circuit found that the suspect's statement that "if that's the case, then—then I might want to talk to my attorney" was ambiguous

9

and did not invoke the right to counsel. In *United States v. Sierra-Estrada*, 248 Fed. Appx. 973, 981 (10th Cir. 2007) (unpublished), the court cited to numerous cases holding that statements such as "I think I need a lawyer" were not clear invocations of the right to counsel.

In this case, Barton's first reference to counsel was "I think this is where I say yes . . . in the presence of an attorney." SA Piniewski tried to clarify whether this was an invocation of the right to counsel by asking: "So, are you saying that you would like to speak to an attorney?" Instead of responding with "yes," which would have made the request unambiguous, Defendant stated that the turn in the discussion was scaring him and that if they were going to keep digging and digging, then "this is where I say no, I need an attorney." Barton's use of if/then language in response does not unambiguously invoke his right to counsel. In *United States v. Zamora*, 222 F.3d 756, 766 (10th Cir. 2000), the Tenth Circuit held that "if/then" language is not an unambiguous invocation of rights. The court agrees with the United States that the use of "if/then" language presents a hypothetical, which falls short of an unequivocal, unambiguous invocation of the right.

Barton's use of the if/then hypothetical resulted in the officers explaining to him that their role was to investigate the fellow passenger's concern and Barton asked for time to think about it. After thinking about giving consent to search, he unambiguously gave the officers the right to search his phone and laptop. However, when they asked him to sign a form to that effect, he again referenced his need for an attorney. He stated: "If you're going to make me sign stuff, I don't want to do that. You can put me in jail if you want. I'll get an attorney and he can decide whether you should look at my computer or not. I'm not an attorney. I really don't know the implications of signing stuff."

10

These statements are equally ambiguous because they are another if/then scenario. If you make me sign something, then I want an attorney. The statements prompted Officer Childers to ask if something had changed because he had just verbally granted them the right to search. And Defendant responded, "Yeah, I thought we were talking like friends and now you're asking me to sign stuff like an attorney would. Now I'm nervous." He expressed concern about being able to understand the consent form because one of the things he has learned being a doctor is that "attorneys don't speak like I do." Piniewski then showed him the form so that he could see it. The officer's response to show him the form in the face of his concerns is a reasonable response in an ambiguous situation. Nothing in what Barton said was a clear and unambiguous invocation of the right to counsel. When she handed him the form, Barton did not respond by saying something to the effect of "show this form to my attorney." Rather, Barton read the form and intelligently discussed it with the officers. On the video of this interaction, nothing appears coercive or anything other than a cooperative back-and-forth discussion. Therefore, even if Barton had the right to counsel with respect to the officer's request to search, he never unequivocally invoked that right.

When an individual consents to a police search and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment. *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). The Tenth Circuit has provided a two-part test for determining voluntariness: (1) the government must "proffer clear and positive testimony that the consent was unequivocal and specifically and intelligently given": and (2) the officers must have used no implied or express duress or coercion." *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010).

A court determines whether a party's consent is voluntary, rather than the product of coercion, from the totality of the circumstances. *Pena*, 143 F.3d at 1366. Some of the circumstances a court considers include: (1) physical mistreatment; (2) use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone; (30 the physical and mental condition and capacity of the defendant; (4) the number of officers on the scene; (5) the display of weapons or whether the weapons are holstered; (6) whether an officer advises the defendant of his *Miranda* rights; (7) whether the officer obtains consent pursuant to a claim of lawful authority; and (8) whether the officer informs a defendant of his right to refuse to consent. *See Schneckloth*, 412 U.S. at 232; *United States v. Drayton*, 536 U.S. 194, 205 (2002); *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012).

Both officers who testified commented on how cooperative Barton was in all of their interactions. When Officer McKay approached him at the gate, he freely shared the text communications on his phone. Barton does not appear to dispute that this information was provided voluntarily. His dispute as to consent focuses on his signing of the consent to search form after he mentioned needing an attorney. The video recording of the interview fully demonstrates the interaction between Barton and the officers leading up to his consent. Defendant does not allege that he was physically mistreated. None of the officers ever touched him. He was treated with respect throughout the interview and the officers never invaded his personal space. Defendant was not in handcuffs. When he asked for a ten-minute break to consider consenting to the search, the officers granted it to him without hesitation.

None of the officers used threats, promises, inducements, deception, trickery, or an aggressive tone. The video dies not support Barton's claim that the officers lectured him or exerted "unyielding pressure." Both officers conversed with Barton is a pleasant manner. The

12

officers were extremely collegial throughout the interview. In response to Barton's question about whether he can refuse to consent, Piniewski states that he might be there longer but he certainly has the right to refuse. Barton claims this is a subtle euphemism for "you'll be here a long time." But she's merely being honest. Factually admitting how the process will work if he does not consent does not amount to coercion. It is the opposite of deceit or trickery. Barton claims that Piniewski laughed at his question of whether he had the right to refuse. But the court did not view her demeanor during that exchange to be any different than the casual back and forth they had engaged in throughout the interview. Barton also appears to assert that the length of time he was detained was coercive. However, he never expressed concern about the length of his detention at the time and never mentioned any concern over missing his connecting flights. Officer McKay explained to him that he was calling in another officer to interview him. He was given drinks, magazines, and the door of the room was left open. In the video, Barton does not seem stressed or concerned about the time the interview is taking and nothing about the atmosphere of the interview appears coercive.

Barton's intelligence and mental capacity to understand what was going on is clearly demonstrated in the video. At the time, Barton was a 57-year-old chiropractor. He comes across intelligent and well-spoken throughout the interview. Barton could tell when matters were getting more serious. He asked thoughtful questions, expressed reasonable concerns, explained his hesitations, and asked for time alone to think through his decision. He also expressed concerns about signing a legal document, and then spent time reading the consent form and discussing it with the officers. The court agrees with the United States that when Barton observed that the consent form was a blank check to search everything on his devices, he controlled the conversation and demanded that language be added to the form to limit the

13

parameters of the search. The officers agreed to his requests before he agreed to sign the form. His questions and discussions with the officers demonstrate that his consent was knowingly and intelligently given.

Nothing in the video comes across as threatening. Barton was in a nice environment, the officers tried to make him feel comfortable, and there were only two officers in the room with him. The officers never displayed their weapons. Piniewski was dressed in jeans and casual shirts and had her firearm tucked into her jeans and covered by her shirt. Childers was wearing a standard police uniform and had her firearm holstered throughout the interview.

Officer McKay advised Barton of his constitutional rights under *Miranda*. Defendant stated that he understood those rights. While Barton disputes whether he unambiguously invoked his right to an attorney, the court has already concluded that his references to the need for an attorney were ambiguous. Barton's discussion of whether he should have an attorney present, however, demonstrates that he knew his rights and knew what was happening.

None of the officers who interacted with Barton falsely claimed to have the authority to search his phone and laptop. All the officers asked for his consent. And Piniewski clearly informed him that he had a right to refuse consent. His right to refuse consent was also clearly provided on the consent-to-search form that Barton appeared to read. After reading the form and asking Piniewski about his right to refuse, Barton proceeded to sign the consent form. His actions on the video appeared completely voluntary when he signed the form.

Barton never retracted his consent after he signed the consent form. He remained in the room with the officers for another hour while the officers located a phone charger and tried to use the OS triage software on his laptop. Based on a review of these factors, the court concludes that Barton voluntarily gave his consent to search his phone and laptop.

14

Barton's challenge as to the two search warrants is based on his allegation that the officers violated his constitutional rights and the evidence obtained from the resulting search warrants are fruits of the poisonous tree.  The court, however, has not found an underlying constitutional violation.  Therefore, Barton's reliance on the fruit of the poisonous tree doctrine to suppress the evidence gained from the search warrants is inapplicable.

Moreover, even if there was an underlying constitutional violation, the information the officers learned prior to such violation provided sufficient information to conclude that there was fair probability that evidence of a crime would be found on Barton's phone and laptop.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Before Piniewski asked for consent to search the devices, the officers knew Barton was engaged in sexually explicit texting with a girl in Belize, the passenger who reported the texting saw some of the texting and Officer McKay saw some of it.  Barton had also admitted to officers that she told him that she was 16-years-old the day before and he continued to text with her.  Based on the information the officers obtained before Piniewski asked for Barton's consent, the officers had reason to believe the devices could contain evidence of the crimes of coercion and enticement, enticing or coercing a minor to engage in sexually explicit conduct outside the United States for the purpose of producing any visual depiction, and traveling in foreign commerce to engage in illicit sexual conduct.  *See* 18 U.S.C. §§ 2422(B), 2251 (c) and (e), 2423(c) and (e).  Therefore, even excluding information the officers obtained after Barton claims a constitutional violation occurred, the remaining information still meets the probable cause standard for the issuance of both search warrants.  *United States v. Karo*, 468 U.S. 705, 719 (19884) ("[I]f sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant [i]s nevertheless

15

valid.").[1]  The August 2017 warrant was valid, and the evidence gathered from its execution and summarized in the March 2021 affidavit establishes probable cause for its issuance.

## CONCLUSION

Based on the above Findings of Fact and Conclusions of Law, Defendant Morris Leon Barton's Motion to Suppress [ECF No. 54] is DENIED.

DATED this 16th day of March, 2023.

BY THE COURT:

_____
DALE A. KIMBALL,
United States District Judge

---

[1] To the extent that Barton challenges the sufficiency of the warrants as they were presented in full, probable cause is clear.